UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| TERRY OLSON, DENNY L. ROBINSON, and ALBERT SIMON, | ) ) ) | No. 05 C 4216 |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Judge Ruben Castillo |
| JENKENS & GILCHRIST, a Texas, Professional Corporation; JENKENS & GILCHRIST, an Illinois Professional Corporation; PAUL M. DAUGERDAS and SPOUSE; DONNA GUERIN and SPOUSE; ERWIN MAYER and SPOUSE; DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC. d/b/a DEUTSCHE BANK ALEX BROWN, a DIVISION OF DEUTSCHE BANK SECURITIES, INC.; TIMMIS & INMAN LLP; GEORGE M. MALIS; HENRY J. BRENNAN, III; ERNST & YOUNG LLP; SAM G. TOROLOPOULOS, CPA; CAROLYN TOROLOPOULOS; and UNKNOWN JOHN DOE DEFENDANTS 1-20, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In the fall of 2000, Plaintiffs Terry Olson, Denny L. Robinson, and Albert Simon sought

the counsel of various lawyers, accountants, and bankers in selling their respective companies

and minimizing their tax liability. The Internal Revenue Service ("IRS"), however, ultimately

found the tax strategy recommended to and used by Plaintiffs to be illegal, and Plaintiffs ended

up losing hundreds of thousands of dollars in the transactions. On July 14, 2005, Plaintiffs filed

suit in the Circuit Court of Cook County against the following Defendants: Jenkens &

Gilchrist—a Texas Professional Corporation ("Jenkens Texas"), Jenkens & Gilchrist—an Illinois

Professional Corporation ("Jenkens Chicago"), Jenkens attorney Paul M. Daugerdas ("Daugerdas"), Jenkens attorney Donna Guerin ("Guerin"), and Jenkens attorney Erwin Mayer ("Mayer") (collectively, "Jenkens" or the "Jenkens Defendants"); Deutsche Bank AG and Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown (collectively, "Deutsche Bank" or the "Deutsche Defendants"); Timmis & Inman LLP ("Timmis & Inman"), Timmis & Inman attorney George M. Malis ("Malis"), and Timmis & Inman attorney Henry J. Brennan, III ("Brennan") (collectively, the "Timmis Defendants"); Sam G. Torolopoulos ("Torolopoulos"); Carolyn Torolopoulos;[1] and Ernst & Young, LLP ("E&Y"). On July 21, 2005, Defendants removed the case to federal court (R. 1, Notice of Removal), and Plaintiffs filed their federal complaint ("Complaint") on September 15, 2005. (R. 25, Compl.)

In response, E&Y and the Timmis Defendants filed separate motions to dismiss the Complaint. E&Y filed a motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), claiming that Plaintiffs have failed to state a claim against them. (R. 37, E&Y Mot. at 1.) The Timmis Defendants filed a motion to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(2) and 12(b)(1), arguing that this Court lacks personal jurisdiction over them and that Plaintiffs' claims against them are barred by the statute of limitations. (R. 32, Timmis Mot. at 1-2.) In the alternative, the Timmis Defendants move this Court to compel arbitration and dismiss the Complaint under Rule 12(b)(1) because the parties previously agreed to submit to binding arbitration in Michigan. (*Id.*) The Deutsche Defendants filed a motion to stay pursuant to section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3. This Court will

---

[1] On December 9, 2005, this Court granted the parties' agreed motion to dismiss Carolyn Torolopoulos without prejudice. (R. 77.)

address each of the Defendants' motions in turn.

## RELEVANT FACTS[2]

In September and October 1999, Defendants Deutsche Bank, Jenkens, and E&Y participated in various planning meetings and conference calls in Chicago to discuss development of a tax shelter strategy using digital option contracts, sometimes called COBRA ("Currency Options Bring Reward Alternatives").[3] (R. 25, Compl. ¶¶ 36-40, 47.) E&Y modified the transactions offered by Jenkens, and the "COBRA transaction that E&Y eventually presented to its clients was different from the transaction previously offered by [Jenkens]." (R. 54, Pls.' Opp'n to E&Y Mot., Ex. 1, Coplan Decl. ¶¶ 3-5.) During a conference call on September 29, 1999, E&Y informed Jenkens that it had designed its own digital options shelter and raised concerns regarding the independence of a Jenkens opinion letter for a transaction developed by Jenkens. (R. 25, Compl. ¶¶ 21, 39.) Jenkens suggested to E&Y that Deutsche Bank be used to

---

[2] Most of the facts recited here are taken from Plaintiffs' Complaint; on a motion to dismiss, the Court takes all of the plaintiff's well-pleaded facts and allegations as true. *Cole v. U.S. Capital*, 389 F.3d 719, 724 (7th Cir. 2004). Other facts are derived from exhibits attached to Plaintiffs' brief in opposition to E&Y's motion to dismiss which the Court may consider without converting this motion into a motion for summary judgment. *See Help At Home Inc. v. Med. Capital, L.L.C.*, 260 F.3d 748, 752-53 (7th Cir. 2001) ("A plaintiff need not put all of the essential facts in the complaint; he may add them by affidavit or brief in order to defeat a motion to dismiss if the facts are consistent with the allegations of the complaint.") The first exhibit is a April 29, 2003 sworn declaration by Robert Coplan of E&Y obtained for grand jury proceedings in a separate matter, and the second exhibit is an E&Y power point presentation. (R. 54, Pls.' Opp'n to E&Y Mot. at 9; Ex. 1, Coplan Decl.; Ex. 2, Power Point.) These additional documents have only been considered as to E&Y's Rule 12(b)(6) motion, as Rule 9(b) has a heightened pleading standard for fraud claims.

[3] "A digital foreign currency option is an all-or-nothing option, which pays a fixed amount when the optioned currency falls below (or exceeds) a preset strike price." *Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 61 n.3 (2d Cir. 2005).

3

perform the underlying currency trades in connection with the COBRA transactions. (R. 54, Pls.' Opp'n to E&Y Mot., Ex. 1, Coplan Decl. ¶ 6.) E&Y recommended that its COBRA clients use Jenkens to prepare the relevant documents. (*Id.* ¶ 8.) Prior to its COBRA presentations to its clients, E&Y worked out the roles and a fixed fee structure for E&Y, Jenkens, and Deutsche Bank. (*Id.* ¶ 7.) Because Jenkens worked jointly with E&Y to plan and structure the COBRA transaction, E&Y obtained a secondary, independent legal opinion from the law firm of Brown & Wood for all of E&Y's COBRA transactions except for the one in which Jenkens was not involved. (*Id.* ¶ 10.)

In 2000, Plaintiffs, each successful businesspeople, sought to sell their companies. (R. 25, Compl. ¶¶ 62, 66.) They were represented in these transactions by Defendants Malis and Brennan, who had represented Plaintiffs in various business dealings since the mid-1980s. (*Id.* ¶¶ 61-62.) Sometime that year, Jenkens and Torolopoulos recruited the Timmis Defendants to assist them in marketing tax shelters to their clients. (*Id.* ¶ 53.)

On or about September 30, 2000, and throughout October 2000 Timmis & Inman made an aggressive sales pitch to Plaintiffs to use the digital options tax strategy to shelter the gains from the sale of Plaintiffs' companies. (*Id.* ¶ 62.) On October 3, 2000, Malis, together with Jenkens' attorney Mayer, held a conference call with Olson and Robinson to promote the tax strategy. (*Id.* ¶¶ 16, 63.) On or about October 5, 2000, Mayer and Malis met at the Jenkens office in Chicago to discuss the COBRA tax strategy and corresponding opinion letter, and they conferred numerous times by phone—sometimes with Brennan—over the course of that month. (*Id.* ¶ 67.) On or about October 11, 2000, Malis and Brennan told Simon that the tax strategy was "rock solid," and encouraged him to pursue it. (*Id.* ¶¶ 68-72.) On or about October 27,

4

2000, Plaintiffs Olson and Robinson met with Malis at Timmis & Inman offices, where Malis offered to perform an independent evaluation of the tax strategy for a fee. (*Id.* ¶ 73.) During the October 2000 meetings, Mayer, Malis, and Brennan represented that through the tax strategy, Plaintiffs' tax liability would be reduced or eliminated. (*Id.* ¶¶ 78, 80.) Malis and Mayer further assured Plaintiffs that the strategy was legal and that an opinion letter by Jenkens would defeat any questions by the IRS as to the tax strategy. (*Id.* ¶ 82.) As part of the strategy, Jenkens prepared a standardized opinion letter asserting the propriety of the tax shelters they helped develop, and the Timmis Defendants helped Jenkens draft the opinion letters. (*Id.* ¶¶ 55, 64.) Plaintiffs did not know that the tax shelters were created and implemented by Jenkens, and they were never told that the Timmis Defendants had a pre-existing relationship with Jenkens and Torolopoulos. (*Id.* ¶¶ 76-77.)

In late October 2000, Plaintiffs agreed to engage in the COBRA tax shelter transactions. (*Id.* ¶ 86.) At the behest of Brennan, Malis and Mayer, Plaintiffs signed account agreements with Deutsche Bank to effectuate the purchase and sale of the digital option contracts. (*Id.* ¶¶ 83, 89.) The Timmis Defendants and Deutsche Bank further recommended that Plaintiffs retain Jenkens and Timmis & Inman to provide legal advice relating to the tax transactions, and Plaintiffs did so. (*Id.* ¶¶ 87-88.)

Plaintiffs paid Jenkens a fee for its opinion letters, and then, unbeknownst to Plaintiffs, Jenkens paid a percentage of that fee to Timmis & Inman as a referral fee, either directly or through a payment made by Jenkens to Torolopoulos and then from Torolopoulos to Timmis & Inman. (*Id.* ¶¶ 47, 75, 98-99.) The Timmis Defendants continued to bill Plaintiffs for tax advice. (*Id.* ¶¶ 98-99.) Jenkens paid additional referral fees to individuals employed by Deutsche Bank.

5

(*Id.* ¶ 100.) Jenkens received fees for developing the strategy and writing a tax opinion letter; and the Deutsche Defendants received fees as a percent of the expected tax savings from the tax strategy. (*Id.* ¶ 47.) The Timmis Defendants did not disclose to Plaintiffs that they received a referral fee from Jenkens. (*Id.* ¶ 48.)

On December 27, 1999, and September 5, 2000, respectively, the IRS issued IRS Notice 99-59, "Tax Avoidance Using Distribution of Encumbered Property," and IRS Notice 2000-44, "Tax Avoidance Using Artificially High Basis." (*Id.* ¶¶ 118, 123, 127.) In December 2001, the IRS announce a "Tax Amnesty Program" to allow certain individuals to avoid accuracy-related penalties. (*Id.* ¶ 140.) The Defendants advised Plaintiffs not to participate in the Amnesty Program. (*Id.*) In June 2003, the IRS made a pronouncement, retroactive to October 18, 1999, which confirmed the illegality of the tax shelters purchased by Plaintiffs. (*Id.* ¶ 162.) The opinion letters drafted by Jenkens and Timmis & Inman were never amended to fully reflect the IRS Notices, despite the fact that the notices were retroactive. Neither did Jenkens, the Timmis Defendants, or the Deutsche Defendants retract, modify, or qualify their advice that the tax strategy was legal. (*Id.* ¶¶ 119, 131, 143.)

In fall 2002, Jenkens notified Plaintiffs that the IRS was investigating the COBRA tax transaction, but Jenkens continued to assert its validity. (*Id.* ¶ 145.) Also during the fall of 2002, Plaintiffs were notified that their income tax returns had been selected for audit by the tax shelter unit of the IRS. (*Id.* ¶ 146.) Plaintiffs claim that they first discovered Defendants' alleged wrongdoing in 2004, when they retained new tax and legal advisors. (*Id.* ¶ 147.)

6

## ERNST & YOUNG'S RULE 12(b)(6) MOTION TO DISMISS

### I.  Legal Standards

E&Y argues that Plaintiffs' Complaint should be dismissed under Rule 12(b)(6) for failure to state a claim, or, in the alternative, under Rule 9(b) for failure to plead fraud with particularity. When considering a motion to dismiss under Rule 12(b)(6), this Court views all facts alleged in the complaint, as well as any inferences reasonably drawn from those facts, in the light most favorable to the plaintiff. *Autry v. Nw. Premium Servs., Inc.*, 144 F.3d 1037, 1039 (7th Cir. 1998). The Court will grant a motion to dismiss under Rule 12(b)(6) only if "no relief could be granted under any set of facts that could be proved consistent with the allegations." *Cler v. Ill. Educ. Ass'n*, 423 F.3d 726, 729 (7th Cir. 2005) (internal citations omitted). "Working hand in glove with Rule 12(b)(6)," Federal Rule of Civil Procedure 8(a) "requires only a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (internal citations omitted). Under Rule 9(b), plaintiffs must go beyond Rule 8(a) and plead the "circumstances constituting fraud" with particularity. Fed. R. Civ. P. 9(b). In other words, the plaintiffs must plead the who, what, when, where, and how of the alleged fraud. *See DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

### II.  Analysis

Plaintiffs assert ten claims against E&Y: fraud and fraudulent misrepresentation (Counts 1-3); violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505 *et seq.* ("Illinois Consumer Fraud Act") (Counts 4-6); conspiracy to defraud (Count 7); declaratory judgment of unjust enrichment (Count 8); breach of the duty of good faith

and fair dealing (Count 9);and a declaratory judgment that Defendants are liable to Plaintiffs for penalties, interests, costs, and professional fees arising out of the filing of Plaintiffs' 2001 tax returns (Count 15). Out of the 290 paragraphs in the Complaint, and including the exhibits attached to Plaintiffs' opposition to E&Y's 12(b)(6) motion to dismiss, Plaintiffs allege only the following specifically as to E&Y:

- In the fall of 1999, E&Y participated in planning meetings with Jenkens and Deutsche Bank to design, market and sell a tax strategy based on digital options instead of Treasury securities. (R. 25, Compl. ¶¶ 25, 32, 35, 38.) Participants from E&Y included Brian Vaughn, Richard Shapiro and Robert Coplan, who are not defendants in this case. (*Id.*)

- E&Y modified the transactions offered by Jenkens and developed its own variation of the digital options strategy. (*Id.* ¶ 39; R. 54, Pls.' Opp'n to E&Y Mot., Ex. 1, Coplan Decl. ¶¶ 3-5.)

- The "COBRA transaction that E&Y eventually presented to its clients was different from the transaction previously offered by [Jenkens]." (R. 54, Pls.' Opp'n to E&Y Mot., Ex. 1, Coplan Decl. ¶¶ 3-5.)

- Jenkens suggested to E&Y that Deutsche Bank be used to perform the underlying currency trades in connection with the COBRA transactions. (*Id.* ¶ 6.)

- E&Y recommended that its COBRA clients use Jenkens to prepare the relevant documents. (*Id.* ¶ 8.)

- Prior to its COBRA presentation to its clients, E&Y worked out the roles and a fixed fee structure for E&Y, Jenkens and Deutsche Bank. (*Id.* ¶ 7.)

- Because Jenkens worked jointly with E&Y to plan and structure the COBRA transaction, E&Y obtained a secondary, independent legal opinion from the law firm of Brown & Wood for all of E&Y's COBRA transactions except for the one in which Jenkens was not involved. (*Id.* ¶ 10.)

- At all relevant times, E&Y participated and benefited [sic] from the tax shelter marketing scheme described herein. (R. 25, Compl. ¶ 22.)

- Internal memoranda at E&Y questioned the validity of the shelters. (*Id.* ¶ 33.)

- Coplan, an E&Y partner, signed a non-disclosure agreement and received Deutsche Bank marketing materials and an opinion letter from Jenkens partner, Daugerdas. (*Id.* ¶ 38.)

- On or about September 29, 1999, E&Y participated in a conference call "to address issues related to the tax shelter strategy." (*Id.* ¶ 39.) During the call, E&Y raised concerns regarding the "independence" of a Jenkens opinion letter validating a transaction developed and promoted by Jenkens. (*Id.*)

- During the September 29, 1999 call, E&Y informed Jenkens that E&Y had designed its own digital options shelter and arranged for a separate law firm to write the opinion letter and an investment bank to execute the transactions. (*Id.*)

- Through October 1999, E&Y, Deutsche and Jenkens discussed changes to the transaction's design, the division of fees and the opinion letter, and E&Y recommended that this transaction be called a digital option rather than a link swap. (*Id.* ¶40.)

- Jenkens, E&Y and Deutsche Bank, together with others, conspired in Chicago to devise and promote the transaction for the purpose of receiving and splitting millions of dollars in fees. (*Id.* ¶ 148.)

As such, Plaintiffs allege that E&Y's only involvement in the alleged "tax shelter scheme" is in the initial creation of the COBRA tax strategy in 1999. The Complaint does not allege that E&Y provided any professional services to Plaintiffs;[4] received any fees from Plaintiffs directly or as a result of any transaction Plaintiffs engaged in; communicated with Plaintiffs in any way; or had any relationship with Plaintiffs whatsoever. While the Complaint does allege that E&Y had a relationship with Jenkens and Deutsche Bank, Plaintiffs do not allege that relationship led to any damages to Plaintiffs. Therefore, as detailed below, Plaintiffs' claims

---

[4] Because Plaintiffs have not alleged that E&Y provided accounting services, contrary to E&Y's argument, the Illinois statute of limitations for claims arising out of an accountant's provision of professional services does not apply to the claims against E&Y. (R. 39, E&Y Mot. to Dismiss at 14-15.)

against E&Y are dismissed without prejudice.

## A. Fraud Counts

Counts 1, 2, 3, 4, 5, and 6 allege that all Defendants committed various frauds against Plaintiffs. In order to state a claim for fraud in each of these Counts, including allegations of fraud under the Illinois Consumer Fraud Act, Plaintiffs must allege that the defendant—in this instance, E&Y—misrepresented or concealed a material fact from Plaintiffs.[5] Plaintiffs, however, do not allege that E&Y ever communicated with Plaintiffs or was even aware of their existence. In fact, Plaintiffs admit that E&Y developed its own COBRA strategy that was different than the one marketed to Plaintiffs and marketed that strategy to its own clients, not to Plaintiffs. In addition, E&Y sought opinion letters from a separate law firm—Brown & Wood—in all but one instance. Thus, E&Y is not alleged to have made any of the allegedly false statements to plaintiffs in Counts 1 through 6, and Plaintiffs do not allege any actionable non-disclosure by E&Y. Furthermore, fraudulent concealment occurs when a person with a duty to speak—arising out of a confidential or fiduciary relationship—conceals facts from another. *Lillien v. Peak6 Invs., L.P.*, 417 F.3d 667, 671-72 (7th Cir. 2005). Yet, in this case, Plaintiffs have not alleged that they had any relationship with E&Y that would give rise to such a duty. As

---

[5] The elements of a common law fraud claim in Illinois are: "(1) a false statement of material fact made by the defendant; (2) the defendant knew the statement was false; (3) the defendant intended for the false statement to induce the plaintiff to act; (4) the plaintiff relied upon the truth of the statement; and (5) the plaintiff suffered damages as a result of his reliance on the statement." *Geschke v. Air Force Ass'n*, 425 F.3d 337, 345 (7th Cir. 2005) (citing *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996)). To state a claim under the Illinois Consumer Fraud Act, 815 Ill. Comp. Stat. 505 *et seq.*, a plaintiff must plead: "(1) the misrepresentation or concealment of a material fact; (2) an intent by the defendant that the plaintiff rely on that misrepresentation or concealment; and (3) that the deception occurred in the course of conduct involving trade or commerce." *Randazzo v. Harris Bank Palatine, N.A.*, 262 F.3d 663, 671 (7th Cir. 2001).

Counts 1 through 6 lack any allegations as to E&Y's participation in any misrepresentation or omission to Plaintiffs, these Counts are dismissed without prejudice as to E&Y.

## B. Civil Conspiracy Count

In Count VII, Plaintiffs allege that Defendants "knowingly conspired to: (1) obtain money by means of false pretenses, representations or promises; (2) defraud Plaintiffs and implement fraudulent and illegal tax shelter transactions; and (3) violate the Illinois Consumer Fraud and Deceptive Trade Practices Act in promoting the transaction." (R. 25, Compl. ¶ 222.) Plaintiffs further claim that all Defendants had a "predetermined and commonly understood and accepted plan of action to obtain excessive and oppressive fees from consumers including Plaintiffs." (*Id.* ¶ 223.) Plaintiffs, however, do not allege that E&Y obtained any money or fees from any transaction related to Plaintiffs, or even that E&Y was aware of transactions involving Plaintiffs. While Plaintiffs do allege that E&Y promoted a version of the COBRA transaction *to their own clients*, Plaintiffs do not allege that E&Y promoted the transaction to Plaintiffs.

The Seventh Circuit has liberally applied the federal notice pleading standard to conspiracy claims, holding that while "Rule 9(b) has a short list of matters (such as fraud) that must be pleaded with particularity; conspiracy is not among them. '[I]t is enough in pleading a conspiracy merely to indicate the parties, general purpose, and approximate date, so that the defendant has notice of what he is charged with.'" *Hoskins v. Poelstra*, 320 F.3d 761, 764 (7th Cir. 2003) (quoting *Walker v. Thompson*, 288 F.3d 1005, 1007 (7th Cir. 2002)). Despite this liberal pleading standard, Plaintiffs' allegations against E&Y fail because they do not give any indication of the nature of E&Y's agreement with the other defendants. *Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 859-60 (7th Cir. 1999); *see also Walker*, 288 F.3d at

11

1007-08 (discussing *Ryan*). Where the plaintiffs' complaint does not "so much as hint at what role [the defendant] might have played or agreed to play in relation" to the purported conspiracy, it fails to state a claim of conspiracy. *Walker*, 288 F.3d at 1007. As to E&Y, "there was only a bare allegation of conspiracy—not enough to enable [E&Y] to prepare [its] defense or for the district court to determine whether the claim was within the ballpark of possibly valid conspiracy claims, the two functions that *Ryan* assigns to notice pleading under the federal civil rules." *Walker*, 288 F.3d at 1008. Thus, Count VII is dismissed without prejudice as to E&Y.

## C.  Declaratory Judgment Counts

### 1.  Count 8

In Count 8, Plaintiffs seek a declaration from the Court that the digital option contracts and all agreements related thereto are unenforceable due to a lack or failure of consideration because the promised tax benefits never materialized and/or Defendants committed fraud in inducing Plaintiffs to enter into the agreements. (R. 25, Compl. ¶ 229-30.) Plaintiffs, however, do not allege that they entered into a contract or agreement with E&Y, or that E&Y induced Plaintiffs into doing anything. Accordingly, Count 8 does not state a claim against E&Y, and must be dismissed without prejudice as to E&Y.

### 2.  Count 15

In Count 15, Plaintiffs seek a declaration from this Court that all Defendants are legally responsible for penalties, fees, and expenses arising out of the IRS audits of Plaintiffs' tax returns. (R. 25, Compl. ¶¶ 280-81.) Plaintiffs seek this declaration in light of the alleged damage resulting from the manner in which Defendants helped prepare Plaintiffs' 2001 tax returns. (*Id.* ¶¶ 279-80.) Plaintiffs do not allege, however, that Defendant E&Y played any role in preparing,

12

recommending, advising, or instructing Plaintiffs on their taxes or their 2001 tax returns. Therefore, Count 15 also does not state a claim against E&Y and must be dismissed without prejudice as to E&Y.

### D.     Breach of Duty of Good Faith and Fair Dealing

Finally, in Count 9, Plaintiffs allege that they "entered into agreements with Defendants with respect to the Digital Options Contracts" that implied a promise of good faith and fair dealing, which Defendants breached. (R. 25, Compl. ¶¶ 235-37.) This Count must also be dismissed as to E&Y because Plaintiffs do not allege that they ever entered into a contract or agreement with E&Y, or that E&Y owed them a duty of good faith and fair dealing for any other reason. Therefore, this Count is also dismissed without prejudice as to E&Y.

## TIMMIS DEFENDANTS' MOTION TO DISMISS,
## OR ALTERNATIVELY TO COMPEL ARBITRATION

Plaintiffs bring all sixteen counts in their Complaint against the Timmis Defendants: fraud and fraudulent misrepresentation (Counts 1-3); violation of the Illinois Consumer Fraud Act (Counts 4-6); conspiracy to defraud (Count 7); declaratory judgment of unjust enrichment (Count 8); breach of the duty of good faith and fair dealing (Count 9); breach of contract (Count 10); breach of duty of care (Count 11); breach of fiduciary duty (Count 12); negligent misrepresentation and professional malpractice (Count 13); breach of contract/professional malpractice (Count 14); declaratory judgment that Defendants are liable to Plaintiffs for penalties, interests, costs, and professional fees arising out of the filing of Plaintiffs' 2001 tax returns (Count 15); and unethical, excessive, and illegal fees (Count 16).

The Timmis Defendants have brought a motion to dismiss under Rule 12(b)(2), arguing

that this Court lacks personal jurisdiction over them. In the alternative, the Timmis Defendants

argue that the parties agreed to submit the matter to binding arbitration in Michigan, and thus,

that this Court should compel arbitration and dismiss the suit under Rule 12(b)(1) for lack of

subject matter jurisdiction. Finally, the Timmis Defendants assert that Malis should be dismissed

from the suit pursuant to Rule 12(b)(6) because Plaintiffs' claims against Malis are barred by the

applicable statute of limitations.

## I.      Personal Jurisdiction

### A.      Relevant Facts

Plaintiffs Olson and Simon are residents of Michigan, and Plaintiff Robinson is a resident

of Nevada. (R. 25, Compl. ¶¶ 1-3.) Defendant Jenkens does business in Illinois, and one of

Jenkens' professional corporations is organized and exists under the laws of Illinois, with its

principal place of business in Chicago, Illinois. (*Id.* ¶¶ 4, 6.) Three of Jenkens' Chicago-based

attorneys—Daugerdas, Mayer, and Guerin—are also listed as defendants in this case; they are all

residents of Illinois. (*Id.* ¶ 7.) Both E&Y and the Deutsche Defendants have offices in and are

engaged in business in the state of Illinois. (*Id.* ¶¶ 11-12, 21.) Defendant Timmis & Inman is a

professional limited liability partnership organized and existing under the laws of Michigan with

its principal place of business in Detroit, Michigan, and the Timmis attorneys named as

Defendants in this lawsuit, Malis and Brennan, are also residents of Michigan. (*Id.* ¶¶ 14, 16.)

### B.      Legal Standard

This case was removed from state court to federal court pursuant to Defendants' motion

arguing that Plaintiffs' claims depend on the resolution of disputed issues of tax law—whether

the tax strategy at issue indeed violated federal law—and thus raises a federal question.[6] (R. 1, Notice of Removal at 6, 8.) To establish personal jurisdiction when, as here, subject matter jurisdiction is predicated on the existence of a federal question, Plaintiffs must show that bringing the Timmis Defendants into federal court in Chicago accords with due process principles and that the Timmis Defendants are amenable to process in this Court. *United States v. De Ortiz*, 910 F.2d 376, 381-82 (7th Cir. 1990) (citing *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987)). The plaintiff bears the burden of showing that personal jurisdiction over the defendant exists; at the motion to dismiss stage, the plaintiff need only make out a *prima facie* case of personal jurisdiction. *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 876 (7th Cir. 2006); *Homer v. Jones-Bey*, 415 F.3d 748, 754 (7th Cir. 2005). The plaintiff is "entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record," and the Court will "read the complaint liberally, in its entirety, and with every inference drawn in favor" of the plaintiff. *Id.* at 877-78 (internal citations omitted).

In federal question cases, due process requires only that each party have sufficient contacts with the United States as a whole rather than any particular state or geographic area, which the Timmis Defendants unquestionably have. *De Ortiz*, 910 F.2d at 382 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945); *Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671-72 (7th Cir. 1987)). Federal Rule of Civil Procedure 4(k) governs whether a defendant is

---

[6] The Deutsche Defendants originally removed this case to federal court, and the remaining Defendants consented to the removal. (R. 1, Not. of Removal at 1, 3.) A defendant does not waive its right to contest personal jurisdiction by filing a petition for removal to federal court. *Silva v. City of Madison*, 69 F.3d 1368, 1376 (7th Cir. 1995).

15

amenable to service in federal court. Rule 4(k) provides that service is effective to establish jurisdiction over the person of a defendant "who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located," or "when authorized by a statute of the United States." Fed. R. Civ. P. 4(k)(1)(A), (D).

In the absence of a federal statutory provision for service, as in this case, Rule 4(k)(1)(A) and Rule 4(e)(1) limit personal jurisdiction to the forum state's long-arm statute. *Omni*, 484 U.S. at 104-05. The Illinois long-arm statute contains a "catch-all" provision that "permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 714-15 (7th Cir. 2002) (citing 735 Ill. Comp. Stat. 5/2-209(c)). While the Illinois long-arm statute contains several clauses specifically enumerating jurisdiction, it also contains the aforementioned "catch-all" provision, which the Seventh Circuit has held may apply even where jurisdiction could not be established through one of the enumerated clauses.[7] *Hyatt*, 302 F.3d at 714-15. While the Illinois Supreme Court has drawn a distinction between the due process rulings of the United States Supreme Court and due process rulings under the Illinois Constitution, *Rollins v. Ellwood*, 565 N.E.2d 1302 (Ill. 1990), the Seventh Circuit has found no "operative difference" between the limits imposed by the Illinois Constitution and the federal limits on personal jurisdiction. *Hyatt*, 302 F.3d at 715 (citing *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997)). Following the Seventh Circuit,

---

[7] In support of their claim for personal jurisdiction over the Timmis Defendants, Plaintiffs cite to the catch-all provision of Illinois' long-arm statute, 735 Ill. Comp. Stat. 5/2-209(c), and to the following enumerated bases for personal jurisdiction in 5/2-209(a): (1) the transaction of any business within this State; (2) the commission of a tortious act within this State; (7) the making or performance of any contract or promise substantially connected with this State; and (11) the breach of any fiduciary duty within this State. 735 Ill. Comp. Stat. 5/2-209(a).

this Court finds in this instance that it is enough to evaluate the limits that Fourteenth

Amendment due process places on a state's exercise of personal jurisdiction. *See Hyatt*, 302

F.3d at 715-16.

> The federal test for personal jurisdiction
>
> requires that the defendant must have minimum contacts with the forum state 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.' Those contacts may not be fortuitous. Instead, the defendant must have 'purposefully established minimum contacts within the forum State' before personal jurisdiction will be found to be reasonable and fair. Crucial to the minimum contacts analysis is a showing that the defendant 'should reasonably anticipate being haled into court [in the forum State],' because the defendant has 'purposefully avail[ed] itself of the privilege of conducting activities' there. While an out-of-state party's contract with an in-state party is not enough alone to establish the requisite minimum contacts, 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' may indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant.

*Id.* at 716 (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945); *Burger King v. Rudzewicz*,

471 U.S. 462, 478 (1985)).

## C.     General Jurisdiction

Personal jurisdiction may be achieved through "general" or "specific" jurisdiction. *Hyatt*,

302 F.3d at 713. General jurisdiction is permitted only where the defendant has "continuous and

systematic general business contacts" with the forum. *Purdue Research Found. v.*

*Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 787 (7th Cir. 2003) (internal citations omitted). "These

contacts must be so extensive to be tantamount to [ ] being constructively present in the state to

such a degree that it would be fundamentally fair to require it to answer in an [Illinois] court,

regardless of the subject matter of the litigation." *Id.* Plaintiffs have not provided any basis for

this Court to find general jurisdiction; however, Plaintiffs note that there may be more

"incidences of [Timmis & Inman] and its lawyers doing business in the State of Illinois" that could form the basis for general jurisdiction, but the Timmis Defendants have not yet provided discovery on this issue. (R. 55, Pls.' Oppos. Br. at 2.) The Complaint, however, does not allege that Timmis regularly or routinely conducts business in Illinois or owns any property in Illinois, and so at this point, Plaintiffs have not made out a *prima facie* case for general jurisdiction over the Timmis Defendants.

### D.     Specific Jurisdiction

The inquiry into specific jurisdiction asks whether it is fundamentally fair to require the defendant to submit to the jurisdiction of this Court with respect to this litigation. *Purdue*, 338 F.3d at 780. The most important factor in this test is foreseeability; that is, whether the defendant could have anticipated being haled into the courts of the state with respect to the claims at issue. *Id.* It must be the activity of the defendant—purposefully availing itself of the privileges of conducting activities in the forum state—that makes it amenable to jurisdiction. *Id.* To determine this, the courts look to whether the defendant has deliberately engaged in significant activities within the forum state, or whether it has created continuing obligations between itself and a resident of the forum state. *Id.* at 780-81 (internal citations omitted). Territorial presence in the forum state is not required as "a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* at 781 (citing *Burger King*, 471 U.S. at 476); *see, e.g., Interlease Aviation Investors II v. Vanguard Airlines, Inc.*, 254 F. Supp. 2d 1028, 1036 (N.D. Ill. 2003) (finding personal jurisdiction where defendant mailed or faxed five communications to Illinois, which contained the alleged misrepresentations providing the basis

18

for plaintiffs' case). Even if the minimum contacts between the defendant and the forum state are weak, certain factors may weigh in favor of the exercise of personal jurisdiction, such as the burden on the defendant, the forum state's interest, the plaintiff's interest in obtaining convenient and effective relief, efficient resolution of the dispute, and the interest in furthering fundamental substantive social policies. *Purdue*, 338 F.3d at 781 (internal citations omitted).

The Timmis Defendants' contacts with Illinois meet the requirements for specific jurisdiction. In arguing that this Court does not have personal jurisdiction over them, the Timmis Defendants rely exclusively on *Harding University v. Consulting Services Group, L.P.*, 22 F. Supp. 2d 824, 827 (N.D. Ill. 1998). In *Harding*, the district court found that a single letter to Illinois was insufficient to establish personal jurisdiction over a defendant in the Northern District of Illinois. *Id.* In this case, by contrast, Plaintiffs allege much more than that E&Y sent one letter to Illinois. While Malis made only one physical visit to Illinois—and allegedly spent ten hours in meetings with Mayer while there—Plaintiffs also allege that the Timmis Defendants communicated repeatedly with Jenkens Chicago via telephone, email, fax, and written correspondence in order to help draft the opinion letters for the tax shelter strategy at issue. (R. 55, Pls.' Opp'n to Timmis Mot. at 4, Ex. 5.) In fact, the Timmis Defendants admit that Malis became involved in the review of the legal theories that were the basis for the Jenkens tax strategy to minimize taxes from Plaintiffs' sale of their companies. (R. 34, Timmis Mot., Ex. D, Malis Aff. ¶¶ 5-7.)[8] Brennan also had phone contact with Jenkens regarding how the tax stratgey

---

[8] A district court may consider affidavits attached to a defendant's motion to dismiss for lack of personal jurisdiction. *See, e.g., McIlwee v. ADM Indus., Inc.*, 17 F.3d 222, 223 (7th Cir. 1994).

19

related to the sale of Plaintiffs' companies, but in his affidavit, Brennan states that the contact was minimal. (R. 34, Timmis Mot., Ex. E, Brennan Aff. ¶ 1.) As for Timmis & Inman, under the Illinois long-arm statute, a non-resident can submit to Illinois jurisdiction through the acts of an agent. 735 ILCS 5/2-209(a) (West 2000); *Wisconsin Elec. Mfg. Co. v. Pennant Prods., Inc.,* 619 F.2d 676, 677-78 (7th Cir. 1980). The Timmis Defendants should have foreseen that all of their contacts with Illinois could have subjected them to suit in this forum. Therefore, this Court has specific jurisdiction over the Timmis Defendants.

Furthermore, Plaintiffs' allegations of conspiracy against the Timmis Defendants are sufficient to establish personal jurisdiction over them. Whether personal jurisdiction can be obtained under a state long-arm statute on a conspiracy rationale is a question of state law. *Stauffacher v. Bennett,* 969 F.2d 455, 459-60 (7th Cir. 1992). Illinois courts have held that a conspiracy theory of jurisdiction may provide the basis for personal jurisdiction because rejecting the conspiracy theory would give "those outside Illinois who have perpetrated an Illinois tort through the agency of others a potentially unfair immunity from suit." *Cleary v. Philip Morris, Inc.,* 726 N.E.2d 770, 775 (Ill. App. Ct. 2000). Moreover, "those that join a conspiracy the purpose of which is to commit fraud or other tort in Illinois should, in some circumstances, reasonably foresee the possibility of being haled into court here," and thus a defendant who has actively supported a conspiracy where one of its members operated in Illinois may have the "minimum contacts" necessary to fairly assert jurisdiction under Illinois' long-arm statute *Id.*

To successfully plead the conspiracy theory of jurisdiction in federal court—such that the minimum contacts test is met as to co-conspirators residing in states other than the forum state—a plaintiff must allege both an actionable conspiracy and a substantial act in furtherance of

20

the conspiracy performed in the forum state. *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392 (7th Cir. 1983). The evidence relating to the conspiracy may be direct or circumstantial. *United States v. Hickok*, 77 F.3d 992, 1005 (7th Cir. 1996). Though the Seventh Circuit has reflected concern that a conspiracy theory of personal jurisdiction merges the jurisdictional issue with the merits, it nevertheless opined that "[i]f through one of its members a conspiracy inflicts an actionable wrong in one jurisdiction, the other members should not be allowed to escape being sued there by hiding in another jurisdiction." *Stauffacher*, 969 F.2d at 459-60.

Cases differ, however, "on how much more than a nakedly conclusory allegation of conspiracy is required." *Id.* While the Seventh Circuit does not require fact pleading with regard to conspiracy, *Hoskins*, 320 F.3d at 764, "a bare allegation of a conspiracy between the defendant and a person within the personal jurisdiction of the court is not enough" to confer personal jurisdiction. *Stauffacher*, 969 F.2d at 460. To establish a *prima facie* case of personal jurisdiction on a conspiracy theory, some cases insist that the plaintiff present "sufficient evidence, whether by affidavit or otherwise, to enable the judge to make a reliable, albeit not definitive, determination, in advance of pretrial discovery and trial, that there really was a conspiracy." *Id.* at 459-60. "Other cases seem content with a minimal factual showing, or even just with specific allegations, of conspiracy." *Id.* More recently, in an unpublished case, the Seventh Circuit suggested that for a plaintiff to demonstrate a *prima facie* case of personal jurisdiction based on conspiracy, the plaintiff must allege some facts such that the Court could find a meeting of the minds among the defendants. *Ahmed v. Quinn*, No. 96-2796, 1997 WL 471335, at *3 (7th Cir. Aug. 13, 1997).

21

The courts of this district have interpreted Seventh Circuit precedent on pleading personal jurisdiction based on conspiracy as requiring that the plaintiff: "(1) make a *prima facie* factual showing of a conspiracy (i.e., point to evidence showing the existence of the conspiracy and the defendant's knowing participation in that conspiracy); (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) show that the defendant's co-conspirator committed a tortious act pursuant to [or in furtherance of] the conspiracy in the forum." *United Phosphorus, Ltd. v. Angus Chem. Co.*, 43 F. Supp. 2d 904, 912 (N.D. Ill. 1999); *see also Reserve Capital, LLC v. CLB Dynasty Trust*, No. 05 C 6556, 2006 WL 1037321, at \*4-5 (N.D. Ill. Apr. 17, 2006) (citing *United Phosphorus*, 43 F. Supp. 2d at 913); *Hollinger Int'l, Inc. v. Hollinger Inc.*, No. 04 C 0698, 2005 WL 589000, at \*14 (N.D. Ill. Mar. 11, 2005) (same); *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F. Supp. 2d 690, 696-97 (N.D. Ill. 2002) (same); *Mueller ex rel. Mueller v. Mueller*, No. 02 C 488, 2002 WL 338874, at \*3 (N.D. Ill. Mar. 4, 2002); *Plastic Film Corp. of Am., Inc. v. Unipac, Inc.*, 128 F. Supp. 2d 1143, 1146 (N.D. Ill. 2001) (same); *Clearclad Coatings, Inc. v. Xontal Ltd.*, No. 98 C 7199, 1999 WL 652030, at \*24 (N.D. Ill. Aug. 20, 1999).

Plaintiffs have made this showing. They detail the division of fees between the Timmis Defendants and Jenkens Chicago, as well as extensive cooperation and correspondence between them in marketing the COBRA tax strategy and developing the legal opinion letter in support of it. Plaintiffs further allege that in their marketing and opinion letter, the Timmis Defendants and Jenkens conspired together to misrepresent the validity of the tax strategy and omit various IRS warnings on the strategy. For example, on December 20, 2000, Plaintiffs allege that Timmis & Inman billed Jenkens Chicago \$78,6000 for telephone calls with Mayer, office conferences

22

between Malis and Mayer, and legal research; as well as $52,000 for matters relating to Plaintiff

Simon and $130,600 for Plaintiffs' tax planning. (R. 55, Pls.' Opp'n to Timmis Mot., Ex. 3.) In

addition, Malis informed Jenkens that Timmis & Inman would pay 5-6% of the "amounts

involved" to Jenkens in the event of a successful investment. (*Id.*, Ex. 4.) At the same time,

Timmis & Inman billed Plaintiffs for 54.2 hours spent from October 2000 to March 21, 2001 on

conferences between Mayer and Malis, a tax memorandum, and an opinion regarding the tax

strategy. (*Id.*, Ex. 5.) Thus, Plaintiffs' complaint presents a *prima facie* case of conspiracy and

the Timmis Defendants' participation in it such that the exercise of personal jurisdiction and

service of process is proper under the Illinois long-arm statute.

## II.    Arbitration

Even though this Court has personal jurisdiction over the Timmis Defendants, this Court

finds that Plaintiffs' claims against them must be submitted to arbitration. The retainer

agreements Plaintiffs signed with Timmis & Inman contain the following agreement to arbitrate:

> Arbitration. While we look forward to a mutually enjoyable relationship with
> you, should any dispute arise between us, we mutually agree that such dispute will
> be subjected to binding arbitration in Oakland County, Michigan pursuant to the
> rules of the American Arbitration Association and that the arbitrators may award
> reasonable attorneys' fees to the prevailing party in such proceedings.[9]

(R. 34, Timmis Mot., Exs. A ¶ 6, B ¶ 6.) Simon entered into a retainer agreement with Timmis

& Inman on or about July 27, 1999, while Robinson and Olson signed their retainer agreement on

or about November 4, 1999. (*Id.*) The agreements further state:

> We understand that you are engaging us to represent you and [the Company's]
> interest in connection with the possible sale of the on-going business and certain

---

[9] Plaintiff Simon's arbitration agreement differs only in that it states that any dispute will
be subject to binding arbitration in Macomb County, Michigan, rather than Oakland County.

23

assets of [the Company]. This engagement may involve the coordination of the
structuring, negotiation and documentation of such transaction with advice
provided on corporate and tax matters. Incident to our traditional legal services,
we will also serve as your financial advisor.

(*Id.*, Exs. A ¶ 1, B ¶ 1.)

Under the Federal Arbitration Act ("FAA"), arbitration may be compelled if the
following three elements are shown: a written agreement to arbitrate, a dispute within the scope
of the arbitration agreement, and a refusal to arbitrate. *Zurich Am. Ins. Co. v. Watts Indus., Inc.*,
417 F.3d 682, 687 (7th Cir. 2005) (citing FAA, 9 U.S.C. § 4). Plaintiffs raise several arguments
contesting the scope and validity of the arbitration agreements. As to scope, Plaintiffs argue that
the arbitration agreements are limited to the sale of Plaintiffs' companies and do not include
services related to Plaintiffs' personal taxes. (R. 55, Pls.' Opp'n to Timmis Mot. at 6.) This
argument, however, contradicts Plaintiffs' claim that they would not have sold their companies
but for alleged promises by the Timmis Defendants that the capital gains realized by the sales
would be adequately sheltered. In addition, the retainer agreements specifically state that Timmis
& Inman would be representing "*you and*" your company, and that Timmis & Inman would also
serve as "*your* financial advisor." Furthermore, the arbitration clauses, as drafted, broadly apply
to "any dispute."

Plaintiffs' arguments that the arbitration agreements are void are also unpersuasive. First,
Plaintiffs argue that the arbitration agreements violate the Michigan rules of professional conduct
because the arbitration agreement prospectively limits the Timmis Defendants' liability to
Plaintiffs, but the Timmis Defendants did not advise Plaintiffs in writing to seek independent
counsel. (*Id.*) The agreement to arbitrate, however, does not limit the Timmis Defendants'

24

liability; rather, it changes the forum that will determine liability.

Second, they argue that the agreements are void for failure of performance (R. 55, Pls.' Opp'n to Timmis Mot. at 6), presumably because Plaintiffs never received the allegedly promised tax savings. Plaintiffs, however, do not provide any evidence that the agreements were void for failure of performance.[10] The Timmis Defendants did provide tax and legal services to Plaintiffs as set out in the retainer agreements (albeit, allegedly improperly or fraudulently), and the contracts do not set out any promised tax savings. Moreover, "courts will not allow a party to unravel a contractual arbitration clause by arguing that the clause was part of a contract that is voidable, perhaps because fraudulently induced. . . . The party must show that the arbitration clause itself, which is to say the parties' agreement to arbitrate any disputes over the contract that might arise, is vitiated by fraud, or lack of consideration or assent. . . that in short the parties never agreed to arbitrate their disputes." *Colfax Envelope Corp. v. Local No. 458-3M, Chicago Graphic Comme 'ns Int'l Union, AFL-CIO*, 20 F.3d 750, 754 (7th Cir. 1994). Plaintiffs, however, do not argue that the arbitration clause itself is void. Indeed, the agreement to arbitrate was supported by sufficient consideration (Timmis' provision of tax and legal services), and Plaintiffs are sophisticated business people who could not claim that they were unaware that the parties had reached an agreement to arbitrate. Thus, the arbitration agreements between Plaintiffs and the Timmis Defendants are valid and enforceable.

As the arbitration agreements are valid and the disputes at issue here fall into the broadly

---

[10] "Where the court's decision on arbitrability collapses into the same inquiry as the decision on the merits, a court may need to touch on the merits of an issue that ordinarily would be decided in arbitration." *Stevens Constr. Corp. v. Chicago Reg'l Council of Carpenters*, 464 F.3d 682, 687 (7th Cir. 2006) (internal citations omitted).

worded agreement to arbitrate, the Timmis Defendants have demonstrated the three elements necessary to compel arbitration. *Zurich*, 417 F.3d at 687. Moreover, even if the arbitration agreement was ambiguous, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *County of McHenry v. Ins. Co. of the West*, 438 F.3d 813, 823 (7th Cir. 2006). Therefore, the Timmis Defendants motion to compel arbitration is granted.[11] A court's granting of a motion to compel arbitration does not authorize dismissal of the litigation, however, and thus, the Timmis Defendants' motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) is denied. *Kroll v. Doctor's Assocs., Inc.*, 3 F.3d 1167, 1172 (7th Cir. 1993); *see also Double Sunrise Inc. v. Morrison Mgmt. Specialists Inc.*, 149 F. Supp. 2d 1039, 1045 (N.D. Ill. 2001) (granting motion to stay case and compel arbitration, but denying motion to dismiss under Rule 12(b)(1) based on *Kroll*, 3 F.3d at 1172); *LaSalle Bus. Credit, L.L.C. v. GCR Eurodraw S.p.A.*, No. 03 C 6051, 2004 WL 1880004, at *4 (N.D. Ill. Aug. 18, 2004) (holding that, under *Kroll*, the district court cannot treat a motion to compel arbitration as a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1)).

---

[11] Because this Court finds that the Timmis arbitration agreements are valid and enforceable, we need not reach the applicability of the Deutsche Bank arbitration agreements to the disputes between Plaintiffs and the Timmis Defendants. In addition, since this Court is enforcing the arbitration agreement between the Timmis Defendants and Plaintiffs, this Court will not discuss the merits of Timmis' 12(b)(6) motion to dismiss certain claims based on a statute of limitations argument. This matter is for the arbitrators. *See AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986) ("in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims"); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) ("Procedural questions which grow out of the dispute and bear on its final disposition are presumptively not for the judge, but for an arbitrator to decide. So, too, the presumption is that the arbitrator should decide allegations of waiver, delay, or a like defense to arbitrability.").

26

## DEUTSCHE DEFENDANTS' MOTION FOR STAY

Finally, the Deutsche Defendants have moved for a stay pending arbitration pursuant to section 3 of the FAA, 9 U.S.C. § 3. Presumably, they have not moved to compel arbitration because, as explained below, they cannot enforce the arbitration agreements at this time. Section 3 requires federal courts to enter a mandatory stay in cases asserting claims that are referable to arbitration by written agreement:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.

Plaintiffs do not contest that the agreements they signed with Deutsche Bank contain a valid agreement to arbitrate their disputes. Indeed, the arbitration agreement states that Plaintiffs agree to arbitrate with Deutsche Bank "any controversies which may arise . . . including any controversy arising out of or relating to any account with [Deutsche Bank], to the construction, performance or breach of any agreement with [Deutsche Bank], or to transactions with or through [Deutsche Bank]." (R. 56, Pls.' Opp'n to Deutsche Mot. at 2, Ex. 1 ¶ 19.) In addition, Plaintiffs do not dispute that by their terms, the account agreements apply to Plaintiffs and their companies, as well as to Deutsche Bank Securities and its corporate parent, Deutsche Bank AG. (R. 33, Deutsche Mot., Exs. 1-8 (agreements state that they apply to Deutsche Bank Securities "and its affiliates").) Moreover, Plaintiffs' allegations against Deutsche Bank AG are substantially, and

perhaps entirely, interdependent with the misconduct they allege against Deutsche Bank Securities, the signatory to the account agreements, and thus the account agreements apply to Deutsche Bank AG as well. *See Zurich*, 417 F.3d at 687.

Plaintiffs argue, however, that their claims are not "referable to arbitration" as required for a section 3 stay because: (1) the arbitration agreement does not apply to "equitable relief" sought "pending arbitration"; and (2) a pending class action in the U.S. District Court for the Southern District of New York defeats the arbitration clause. (R. 56, Pls.' Opp'n to Deutsche Mot. at 2-3.)

## A. Pending Class Action

The account agreements between Plaintiffs and Deutsche Bank state that: "No person shall . . . seek to enforce any pre-dispute arbitration agreement against any person . . . who is a member of a putative class . . . until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court." On August 28, 2003, a putative class action, *Denney, et al. v. Jenkens & Gilchrist, et al.*, No. 03-CV-5460, was filed in the U.S. District Court for the Southern District of New York, and the parties agree that this class action encompasses at least a portion of Plaintiffs' claims. On February 22, 2005, Judge Scheindlin entered an opinion and order certifying a class action pursuant to Fed. R. Civ. P. 23(b)(3) and approving a class-wide settlement with defendant law firm Jenkens & Gilchrist and three of their attorneys—Daugerdas, Mayer, and Guerin. *Denney v. Deutsche Bank AG, et al.*, 443 F.3d 253, 259 (2d Cir. 2006). The Deutsche Defendants appealed from the judgment. The Second Circuit held that the district court did not abuse its discretion in certifying the *Denney* class, but ruled that the contribution and indemnity provisions insufficiently protected the rights

28

of nonsettling defendants and third parties. *Id.* at 260.

As the class certification was granted and the Second Circuit refused to de-certify the class, Deutsche Bank would only be precluded from enforcing the arbitration agreement if Plaintiffs were "excluded from the class by the court." The parties agree that Plaintiffs have not been excluded from the class by the court.[12] Plaintiffs argue that this means the dispute is not referable to arbitration—and thus not subject to the FAA's mandatory stay provision—because the Deutsche Defendants' claimed right of arbitration does not presently exist and may not come into being in the foreseeable future. (R. 56, Pls.' Opp'n to Deutsche Mot. at 3.) The Deutsche Defendants counter that although the pending class action temporarily limits its rights to compel arbitration of Plaintiffs' claims, the disputes are still ultimately referable to arbitration if they are not resolved in the class action, and thus, this Court should protect Deutsche's right to arbitration and mandate a section 3 stay. (R. 67, Deutsche Reply at 3.)

This Court agrees with Deutsche Bank. In the absence of a stay of litigation, Deutsche Bank's right to arbitrate will be effectively nullified. The arbitration agreement between Deutsche Bank and Plaintiffs unambiguously states that the arbitration agreement shall not be enforced *until* Plaintiffs are excluded from the class action by the court. The agreement does not state "if" Plaintiffs are excluded from the class action; rather, the agreement presumes that any disputes remain ultimately referable to arbitration until the designated event: which has not

---

[12] Although Deutsche Bank argues that by proceeding with the instant action Plaintiffs have chosen to forego being part of the *Denney* class action process (R. 67, Deutsche Reply at 4), Plaintiffs have not opted out of the *Denney* class. *See, e.g., Tropp v. Western-Southern Life Ins. Co.*, 381 F.3d 591, 596 (7th Cir. 2004) (person included as member of class in settlement agreement because he received notice but did not opt out of class); *In re Copper Antitrust Litig.*, 436 F.3d 782, 793 (7th Cir. 2006) (once party opts out of class, party must take steps to protect rights or suffer the consequences).

occurred yet in this case. In determining whether claims are "referable to arbitration" under the FAA, the court must "focus solely on the arbitration clause and determine whether there is an agreement to arbitrate the underlying dispute," *Flender Corp. v. Techna-Quip Co.*, 953 F.2d 273, 277 (7th Cir. 1992). Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Thus, the dispute between Plaintiffs and Deutsche Bank remains referable to arbitration, and this Court must grant a stay pursuant to section 3 of the FAA.

## B. Equitable Relief Pending Arbitration

Nevertheless, the account agreements between Plaintiffs and Deutsche Bank also contain the following language: "Neither you nor I waive any right to seek equitable relief pending arbitration." Plaintiffs argue that its claims are not referable to arbitration based on this language, while the Deutsche Defendants counter that this language means parties may seek provisional remedies in aid of arbitration; not that equitable issues are not referable to arbitration. Both arguments miss the mark here as this contractual provision does not even apply to the claims in Plaintiffs' Complaint. Plaintiffs' Complaint alleges fourteen legal claims for damages, two claims for declaratory relief, and not one claim for equitable relief. *See, e.g., Berger v. Xerox Corp. Ret. Income Guarantee Plan*, 338 F.3d 755, 763 (7th Cir. 2003) (Declaratory relief is distinct from equitable relief; a declaratory judgment is usually a prelude to a request for monetary and equitable relief.). Therefore, this Court grants Deutsche Bank's motion for a stay

pursuant to section 3 of the FAA.[13]

## CONCLUSION

For the reasons set forth above, this Court grants E&Y's motion to dismiss all of Plaintiffs' claims against E&Y without prejudice. (R. 37.) The Timmis Defendants' motion to dismiss under 12(b)(2) and 12(b)(6) is denied. (R. 32.) The Timmis Defendants' motion to compel arbitration is granted, but their motion to dismiss the case against them for lack of subject matter jurisdiction under Rule 12(b)(1) is denied. (R. 32.) The Deutsche Defendants' motion for a stay pending arbitration pursuant to section 3 of the FAA is granted as to the Deutsche Defendants. (R. 31.)

Plaintiffs are given until December 8, 2006 to file an amended complaint as to Ernst & Young in accordance with this opinion, and the Court will hold a status hearing on December 12, 2006, to obtain the parties' views on whether or not a stay should be entered for the entire litigation.[14]

ENTERED:

Judge Ruben Castillo
United States District Court

Dated: November 17, 2006

---

[13] This stay does not deprive Plaintiffs of the right to seek equitable relief if it is warranted. "The issuance of a stay pending arbitration should not deprive a litigant of the right to seek such protection as he may need against irreparable injury before he can—if he can—request such relief from the arbitral panel." *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 527 (7th Cir. 1996).

[14] *See IDS Life Ins. Co.*, 103 F.3d at 527-29.

31